BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

THE COFFMAN LAW FIRM
RICHARD L. COFFMAN
First City Building
505 Orleans St., Suite 505
Beaumont, TX  77701
Tel: 409/833-7700
866/835-8250 (fax)
rcoffman@coffmanlawfirm.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL  60602
Tel: 312/621-2000
312/641-5504 (fax)
b.barnow@barnowlaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| MARTIN FERNANDEZ, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LEIDOS, INC. and SCIENCE APPLICATIONS INTERNATIONAL, INC.,<br><br>Defendants. | Case No:<br><br>CLASS ACTION<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

BLOOD HURST & O'REARDON, LLP

00077097

Case No.

CLASS ACTION COMPLAINT

# CLASS ACTION COMPLAINT

Plaintiff Martin Fernandez ("Plaintiff" or "Fernandez"), on behalf of himself and all other similarly situated persons, brings this action against Defendants Leidos, Inc. and Science Applications International Corporation,[1] and respectfully shows the following:

## NATURE OF THE ACTION

1.      Plaintiff, individually and on behalf of all other similarly situated persons (the "Class Members"), brings this California consumer class action to secure redress for SAIC's intentional, willful, and reckless violations of their property and privacy rights.  Plaintiff and Class Members are consumers of health care coverage, medical and dental care, medical and dental products and services and medications who entrusted their personally identifiable information ("PII") and medical records and private health information ("PHI") (together, "PII/PHI") to SAIC.  In September 2011, SAIC betrayed Plaintiff's and Class Members' trust by failing to properly safeguard and protect their PII/PHI, and publicly disclosing their PII/PHI without authorization (the "Data Breach"), in violation of numerous laws, including, *inter alia*, the California Confidentiality of Medical Information Act ("CMIA") (CAL. CIV. CODE §56, *et seq.*), California Unfair Competition Law (CAL. BUS. & PROF. CODE §17200, *et seq.*), and California common law.

2.      Plaintiff and Class Members are current and former United States military servicemen, servicewomen, and the family members of these servicemen and women.  The Class Members are geographically dispersed throughout California, and possibly other parts of the United States and overseas, who were residents of California at the time of the Data Breach.

---

[1]      On September 27, 2013, Defendant Science Applications International Corporation changed its name to Leidos, Inc., and spun-off a $4 billion government services and information technology company named Science Applications International Corporation. Before the split, Leidos, Inc. employed 39,600 employees and had $525 million of net income on revenue of $11.17 billion for the fiscal year ended January 31, 2013, making it number 240 on the Fortune 500 list. Leidos, Inc. has 22,000 employees and had revenue of $5.77 billion for its fiscal year ended January 31, 2014.

For purposes of this Complaint, Leidos, Inc. and Science Applications International Corporation will together be referred to as "SAIC."

Case No.

00077097

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

3.      The United States Department of Defense ("DOD"), by and through the Secretary of Defense, contracted with SAIC to provide a variety of services, including electronic information management and data security services for safeguarding and protecting Plaintiff's and Class Members' PII/PHI, all of which was entrusted to SAIC in connection with obtaining health care coverage, medical and dental care, medical and dental products and services and medications.  Pursuant to these contracts and as employment benefits, DOD paid SAIC tens of millions of dollars per year.  For example, in May 2011, DOD renewed its contract with SAIC to provide these services under a three-year $53 million contract.  On or about February 6, 2012, after the unlawful disclosure of Plaintiff's and Class Members' PII/PHI in question here, DOD again extended the contract.

4.      On September 29, 2011, TRICARE,[2] the DOD healthcare program in effect at the time of the Data Breach that provided health benefits for military personnel, retirees, and their dependents, publicly admitted that on September 12, 2011, Plaintiff's and Class Members' PII/PHI was unlawfully disclosed (the "Data Breach").  Plaintiff's and Class Members' PII/PHI was contained on backup data tapes transported in an unsecure manner by a newly hired, low-level SAIC employee in his personal vehicle.  The data tapes were taken from the vehicle while it was parked in downtown San Antonio, Texas, and left unattended for over eight hours.

5.      The wrongfully disclosed PII/PHI included, *inter alia*, Plaintiff's and Class Members' Social Security numbers, addresses, dates of birth, telephone numbers, and personal health data – including private medical records, health provider information, laboratory test results, medical diagnoses, and prescription medication information.  This type of PII/PHI disclosure is amongst the most harmful because it contains highly confidential personal health information (PHI) leading to false medical claims and charges to one's history, creating

---

[2]      TRICARE was managed by Tricare Management Activity (TMA) under the authority of the Assistant Secretary of Defense (Health Affairs).  TRICARE was the civilian care component of the Military Health System, although it also included health care delivered in military medical facilities.  On October 1, 2013, TMA disestablished and TRICARE responsibility was transferred to the Defense Health Agency, which was established the same day.

00077097
CLASS ACTION COMPLAINT

diagnosis errors of serious magnitude, and may remain available for such illegal and serious misuse for years, let alone requiring great effort often employing professional help to correct the illegal usage and damage that has occurred.  SAIC flagrantly disregarded Plaintiff's and Class Members' privacy rights by intentionally, willfully, and recklessly failing to take the necessary precautions required to safeguard and protect their PII/PHI from unauthorized disclosure.  Plaintiff's and Class Members' PII/PHI was improperly handled and transported, either unencrypted or improperly partially encrypted, unprotected, readily able to be copied by data thieves, and not kept in accordance with basic security protocols.  As described in greater detail below, the wrongfully disclosed and compromised PII/PHI was transferred, sold, opened, read, mined and otherwise used without Plaintiff's and Class Members' authorization.

6.     SAIC inexplicably and without justification failed to properly encrypt the wrongfully disclosed PII/PHI, and then intentionally, recklessly and willfully allowed an untrained, or improperly and inadequately trained, low-level employee to transport the PII/PHI in an unsecure manner.  SAIC's wrongful actions, inaction, and omissions directly and proximately caused the Data Breach and the wrongful disclosure of Plaintiff's and Class Members' PII/PHI to the world.

7.     SAIC's intentional, willful and reckless disregard of Plaintiff's and Class Members' privacy rights caused one of the largest unauthorized disclosures of PII/PHI in history.

8.     Plaintiff and Class Members are concerned about their finances, credit, identities, medical records, and PII/PHI and, as such, regularly monitor their credit, monitor their financial accounts and/or carefully store and dispose of their PII/PHI and other documents containing their PII/PHI.  The concern is reasonable and justified.  Since the Data Breach, Plaintiff and Class Members have experienced identity theft,[3] identity fraud, medical

---

[3]     According to the United States Government Accounting Office (GAO), the terms "identity theft" or "identity fraud" are broad terms encompassing various types of criminal activities.  Identity theft occurs when PII/PHI is used to commit fraud or other crimes.  These crimes include, *inter alia,* credit card fraud, phone or utilities fraud, bank fraud and government fraud (theft of government services, including medical services).

3                                   Case No.

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

fraud,[4] lost medical identities and records, fraudulent credit card activity, the opening or re-opening of new credit card accounts in their name, phishing,[5] increased mailers marketing products and services including, *inter alia,* medical products, medical services and prescription drugs specifically targeted to their medical conditions.

9. Plaintiff has standing to bring this suit because as a direct and proximate result of SAIC's wrongful actions, inaction and omissions, and the resulting Data Breach, Plaintiff has suffered (and will continue to suffer) economic damages and other injury and harm in the form of, *inter alia,* (i) actual identity theft, identity fraud and/or medical fraud, (ii) invasion of privacy, (iii) breach of the confidentiality of his PII/PHI, (iv) statutory damages under the California CMIA, (v) lost benefit of his bargain, (vi) deprivation of the value of his PII/PHI, for which there is a well-established national and international market,[6] (vii) diminished value

---

[4]     Medical fraud (or medical identity theft) occurs when a data thief uses a victim's name or health insurance numbers to see a doctor, get prescription drugs, file claims with insurance providers, or obtain other medical care. *See* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited August 10, 2014). If the thief's health information is mixed with the victim's information, the victim's medical treatment, insurance and payment records, and credit report may be affected. *Id.*

[5]     "Phishing" is an attempt to acquire information (and sometimes, indirectly, money), such as usernames, passwords and credit card details by masquerading as a trustworthy entity through an electronic communication. Communications purporting to be from popular social websites, auction sites, online payment processors or IT administrators are commonly used to lure the unsuspecting public. Phishing emails may contain links to websites that are infected with malware. Phishing is typically carried out by e-mail spoofing or instant messaging, and often directs users to enter details at a fake website that looks and feels almost identical to the legitimate one. When criminals have access to PII/PHI from a large group of similarly situated victims, it is much more feasible to develop a credible phishing spoof email that appears realistic. They then can convince a group of victims to reveal additional private information, such as credit card numbers, bank accounts, and the like.

[6]     PII/PHI is a valuable property right. *See, e.g.,* John T. Soma, *et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich. J.L. & Tech. 11, at *3-*4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted). It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" for several years. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

Theft of PHI is also gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected." *See* Federal Trade Commission, *Medical Identity Theft,* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited

4

Case No.

of the healthcare products, medical insurance and medical services he purchased from the Federal Government (*i.e.*, TRICARE),[7] and/or (viii) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud – risks justifying expenditures for protective and remedial services for which he is entitled to compensation.

10.     Accordingly, Plaintiff, on behalf of himself and all others similarly situated, seeks redress from SAIC for, *inter alia*, violations of the California CMIA, violations of the California Unfair Competition Law, and California common law.

11.     Plaintiff, on behalf of himself and all others similarly situated, seeks (i) actual and other economic damages, consequential damages, nominal damages, and/or statutory damages, (ii) punitive damages, and (iii) attorneys' fees, litigation expenses and costs of suit.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. §1332(a), because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.   This Court also has subject matter

---

March 27, 2014).  Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves.  Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

The value of PHI as a commodity also is measurable.  *See, e.g.,* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market* (April 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited June 26, 2014); Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the* Online *Black Market* (July 16, 2013) (all-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers and bank account information, complete with account and routing numbers, are fetching $1,200 to $1,300 each), http://www.scmagazine.com/health-insurance-credentials-fetch-high-prices-in-the-online-black-market/article/303302/ (last visited June 26, 2014).

[7]     As a direct and/or proximate result of SAIC's failure to follow contractually-agreed upon, federally-prescribed, industry standard security procedures, Plaintiff and numerous Class Members received a diminished value of the products, insurance and/or services they paid TRICARE to provide.  On information and belief, for example, a portion of the health and dental insurance premiums paid by certain Plaintiff and Class Members to TRICARE funded healthcare-related services, such as data management and data security.  Plaintiff and Class Members who purchased their health and dental insurance from TRICARE contracted for an insurance plan that included a guarantee by SAIC to safeguard and protect their PII/PHI, but instead, received a plan devoid of these important protections.  Despite failing to implement or inadequately implementing policies to safeguard and protect their PII/PHI, SAIC had the beneficial use and enjoyment of the full amount of the insurance premiums without providing the full complement of promised services.

5

Case No.

**CLASS ACTION COMPLAINT**

jurisdiction over this action, pursuant to 28 §1332(d) (CAFA), because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from SAIC's citizenship, and (c) the matter in controversy exceeds $5,000,000 USD exclusive of interest and costs.

13.    This Court has personal jurisdiction over SAIC because at all relevant times, SAIC conducted (and continues to conduct) substantial business in the Eastern District of California.

14.    Venue is appropriate in this Court, pursuant to 28 U.S.C. §1391, because SAIC is subject to personal jurisdiction in the Eastern District of California, and a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of California.

## **PARTIES**

15.    Plaintiff Martin Fernandez ("Fernandez"), a resident of Elk Grove, California, is a retired weapons and logistics Specialist E4 in the United States Army.  SAIC possessed, and currently possesses, Fernandez's most sensitive personal and medical information (*i.e.,* his PII/PHI), which SAIC was and is required to keep confidential.  Fernandez received a letter from SAIC confirming his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and wrongfully disclosed to the world.  Thereafter, one or more data thieves, and their subsequent customers or others coming into possession of the wrongfully disclosed PII/PHI, transferred, sold, opened, read, mined and otherwise used Fernandez's PII/PHI, without his authorization, to their financial benefit and his financial detriment and other harm.

16.    Fernandez and his wife have never been the victims of any data breach other than the SAIC Data Breach.  Prior to and since the Data Breach, they have meticulously protected their PII/PHI, regularly checking their online accounts for irregularities and maintaining their PII/PHI paper records in a locked cabinet in their home for five years, after which they shred the paper records.  After the Data Breach, Fernandez experienced several

## CLASS ACTION COMPLAINT

1    instances of identity theft, identity fraud and medical fraud that logically could only be the

2    direct and/or proximate result of the Data Breach.

3         17.    For example, in April 2012, Fernandez secured employment as an

4    armaments/logistics government contractor at Travis Air Force Base in north central

5    California, subject to obtaining the appropriate security clearance.  Fernandez, however, could

6    not obtain the required security clearance because certain addresses at which he never lived,

7    and certain large purchases he never made, appeared on his credit reports and did not match

8    his actual previous addresses listed on his employment application.  The fraudulent entries on

9    his credit reports logically could only be the direct and/or proximate result of the Data Breach.

10   Because he could not obtain the required security clearance, Fernandez lost the government

11   contractor position, which paid $55,000-$60,000 per year.

12        18.    As a further direct and/or proximate result of the Data Breach, Fernandez also

13   experienced other forms of identity theft and/ identity fraud, including: (i) multiple attempted

14   logins to his Microsoft and Yahoo accounts requiring him to change his passwords and login

15   information several times, and (ii) notification by his bank, Bank of America, that someone

16   posing as Fernandez attempted to open a bank account in a Bank of America branch in San

17   Diego, California, using his wrongfully disclosed and compromised PII/PHI.

18        19.    As a further direct and/or proximate result of the Data Breach, Fernandez also

19   has experienced medical fraud.  For example, from a time commencing shortly after the Data

20   Breach to the present, Plaintiff Fernandez has received an ongoing and increasing stream of

21   electronic mail and regular mail advertisements from drug companies, Canadian online

22   pharmacies, and other health care providers specifically targeting three medical conditions

23   from which he suffers.  Fernandez did not receive the type and volume of such targeted

24   advertisements prior to the Data Breach.  These advertisements logically could only be the

25   direct and/or proximate result of the data thieves and their customers buying, selling, opening,

26   reading, mining, and using Fernandez's PII/PHI wrongfully disclosed in the Data Breach.

27        20.    While on active duty in South Korea in 2008, Fernandez injured his left eye,

28   which has required ongoing treatment.    Recently, while at the San Pablo Veterans

BLOOD HURST & O'REARDON, LLP

Case No.

00077097

**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

Administration Clinic in Mare Island, California, there was confusion regarding his appointment and treatment. Fernandez was informed that several other persons named "Martin Fernandez" with his birthdate had been treated at the clinic for medical conditions from which Fernandez does not suffer. Fernandez also has been involved in a lengthy dispute with the Veterans Administration regarding the proper amount of compensation for his injured eye. Fernandez has been required to go through multiple levels of appeal. At each appellate level, however, a determination could not be made because Fernandez's medical records are lost and incomplete. The Veteran Administration's inability to make a determination, in turn, has delayed and reduced the amount of Fernandez's compensation for his injury. The medical fraud at the San Pablo Veterans Administration Clinic and Fernandez's lost medical records logically could only be the direct and/or proximate result of the data thieves and their customers buying, selling, opening, reading, mining, and using Fernandez's PII/PHI wrongfully disclosed in the Data Breach.

21. As a direct and/or proximate result of SAIC's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the resulting identity theft, identity fraud, and medical fraud inflicted on him by one or more unauthorized third parties, Fernandez also has suffered (and will continue to suffer) economic damages and other injury and harm in the form of the deprivation of the value of his PII/PHI, for which there is a well-established national and international market. PII/PHI is a valuable property right. *See* Note 6, *supra*. Faced with the choice of having his PII/PHI disclosed, compromised, transferred, sold, opened, read, mined and otherwise used without his authorization versus selling his PII/PHI on the black market and receiving the compensation himself, Fernandez would choose the latter.[8] Fernandez – not

---

[8] It also is important to note that in the case of identity theft or identity fraud, after a victim goes through the hassle of closing credit cards, changing passwords on financial accounts, and notifying lenders and the credit bureaus, the victim's PII is again private from that point forward.

In the case of a medical data breach, however, there is no opportunity for a clean start. Once a victim's PHI is out – such as Plaintiff's and Class Members' PHI – it is out forever. If there is a negative stigma associated with a victim's PHI – such as a sexually-transmitted disease, an abortion, a sex change operation, or a slow-growing cancer – it cannot be undone.

Even worse, the consequences of having one's PHI fall into the hands of unscrupulous individuals can literally be life threatening. When a thief uses a victim's PHI to obtain

00077097

data thieves – should have the exclusive right to monetize his PII/PHI.  SAIC's wrongful actions, inaction and omissions, and the resulting Data Breach, deprived him of this right.

22.     As a direct and/or proximate result of SAIC's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the resulting identity theft, identity fraud and medical fraud inflicted on her by one or more unauthorized third parties, Fernandez received a diminished value of the services he paid TRICARE to provide.  Upon information and belief, a portion of the health insurance premiums and dental insurance premiums Fernandez paid was for healthcare-related services, such as data management and data security.  Fernandez contracted for insurance that included SAIC's guaranty to safeguard and protect his PII/PHI, but instead, received insurance devoid of these important protections.  Despite failing to implement or inadequately implementing policies to safeguard and protect Fernandez' PII/PHI, SAIC has had the beneficial use and enjoyment of the full amount of such payments.

23.     As a further direct and/or proximate result of SAIC's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the resulting identity theft, identity fraud and medical fraud inflicted on him by one or more unauthorized third parties, Fernandez has suffered (and will continue to suffer) other economic damages and injury and harm, including (i) actual identity theft, identity fraud and/ medical fraud, (ii) invasion of privacy, (iii) breach of the confidentiality of his PII/PHI, (iv) statutory damages under the California CMIA, (v) lost benefit of his bargain, (vi) deprivation of the value of his PII/PHI, for which there is a well-established national and international market, and (vii) an imminent, immediate and/or continuing increased risk of identity theft, identity fraud and/or medical fraud – for which he is entitled to compensation.

24.     Defendant Leidos, Inc. is a Delaware corporation, with its principal place of business in Reston, Virginia.  Leidos, Inc. is an American defense company that provides scientific, engineering, systems integration, and technical services.  Leidos, Inc. works

medical care, the imposter's information could end up on the victim's medical record.  If the PHI theft victim subsequently was involved in an accident and rushed to the emergency room, doctors utilizing his or her PHI could see the wrong blood type, not know the victim is allergic to certain medications, and/or has a pre-existing condition – which, in turn, could lead to misdiagnosis or mistreatment with potentially deadly consequences.

Case No.

00077097

BLOOD HURST & O'REARDON, LLP

extensively with the DOD, United States Department of Homeland Security, and the United States Intelligence Community, including the National Security Agency, as well as other United States government agencies and selected commercial markets.  Leidos, Inc. has offices throughout California, including the Eastern District of California.

25.     At all relevant times, Leidos, Inc. provided, among other services, electronic information management services and/or cyber security services to DOD and its agencies, including TRICARE.   At all relevant times, Leidos, Inc. provided electronic information management services and cyber security services to TRICARE at various San Antonio area military medical treatment facilities in connection with the provision of medical treatment and medical services to Plaintiff and Class Members in consumer transactions during the Class Period – to wit, in order to receive health care coverage, medical and dental care, medical and dental products and services and medications, Plaintiff and Class Members were required to provide their PII/PHI to Leidos, Inc.  At all relevant times, Leidos, Inc. was (and continues to be) entrusted with, and obligated to protect, Plaintiff's and Class Members' PII/PHI and the PII/PHI of their families.  Leidos, Inc. may be served with Summons and a copy of the Class Action Complaint by serving its registered agent for service of process in the State of California, CT Corporation Systems, 818 West 7th Street, 2nd Floor, Los Angeles, California 90017.

26.     Defendant Science Applications International Corporation is a Delaware corporation with its principal place of business in McLean, Virginia.  According to its website, Science Applications International Corporation is a technology integrator, providing full life-cycle services and solutions in the technical, engineering, and enterprise information technology markets, including systems engineering and integration offerings for large, complex government and commercial projects.   Science Applications International Corporation's approximately 13,000 employees serve customers in the Federal Government and global commercial markets, specializing in providing a broad range of higher-end, differentiated technical capabilities.   Science Applications International Corporation has offices throughout California, including the Eastern District of California.

BLOOD HURST & O'REARDON, LLP

27.     At all relevant times, Science Applications International Corporation, on information and belief, provided, among other services, electronic information management services and cyber security services to DOD and its agencies, including TRICARE.  At all relevant times, Science Applications International Corporation, on information and belief, provided electronic information management services and cyber security services to TRICARE at various San Antonio area military medical treatment facilities in connection with the provision of medical treatment and medical services to Plaintiff and Class Members in consumer transactions during the Class Period – to wit, in order to receive health care coverage, medical and dental care, medical and dental products and services and/or medications, Plaintiff and Class Members were required to provide their PII/PHI to Science Applications International Corporation.    At all relevant times, Science Applications International Corporation, on information and belief, was (and continues to be) entrusted with, and, if so, obligated to protect, Plaintiff's and Class Members' PII/PHI and the PII/PHI of their families.  Science Applications International Corporation may be served with Summons and a copy of the Class Action Complaint by serving its registered agent for service of process in the State of California, CT Corporation Systems, 818 West 7th Street, 2nd Floor, Los Angeles, California 90017.

## FACTS

**A.     Introduction.**

28.     As an agency within the Military Health System of the DOD, TRICARE, at all relevant times, managed a fully integrated health care system that provided health care coverage, prescription services, and medical and dental care for current and former military personnel, their families and anyone else entitled to DOD health benefits.

29.     In doing so, TRICARE and DOD were entrusted with, and obligated to safeguard and protect, Plaintiff's and Class Members' PII/PHI in accordance with all applicable laws.  TRICARE and DOD contracted with SAIC as part and parcel of fulfilling their PII/PHI protection obligations to Plaintiff and Class Members.

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

30.     As a third-party vendor of PII/PHI protection services to TRICARE and DOD, SAIC was required to safeguard and protect Plaintiff's and Class Members' PII/PHI under federal law, including the Health Information Portability and Accountability Act ("HIPAA").

31.     HIPAA's Security Rules set out a list of business processes and technical requirements SAIC was required to follow to ensure the security of Plaintiff's and Class Members' PII/PHI, including (i) administrative safeguards to manage security measures and conduct of personnel that access, view, process and distribute electronic PHI; (ii) physical safeguards that protect physical equipment and related buildings from physical intrusions; and (iii) technical safeguards that protect, control and monitor access to PHI.

32.     In addition, the Health Information Technology for Economic and Clinical Health Act (HITECH), part of the 2009 American Recovery and Reinvestment Act, requires healthcare organizations to ensure that patient information in PHI is unusable, unreadable, or indecipherable to unauthorized individuals.

33.     In August 2009, the U.S. Department of Health and Human Services ("HHS") published an interim final rule requiring either encryption or destruction to ensure the security of PHI.  The National Institute of Standards and Technology developed the rule further, creating guidelines requiring federal agencies to encrypt data using the Advanced Encryption Standard, which was adopted as a federal standard in 2002.[9]

34.     DOD also purports to have medical records safeguards in place at all military treatment facilities to ensure the safety and confidentiality of its patients' PHI, including educating staff about their responsibility for the records, periodic records audits, and designating privacy officers to ensure PHI remains private.

35.     At all relevant times, TRICARE expressly stated on its website and handbooks for the Tricare Prime, Tricare for Life, Tricare Prime Overseas, Tricare Prime Remote Overseas, Tricare Standard and Extra health insurance plans that as TRICARE beneficiaries, Plaintiff and Class Members should expect the following:

---

[9]     The interim rule in effect at the time of the Data Breach may be found at http://www.gpo.gov/fdsys/pkg/FR-2009-08-24/pdf/E9-20169.pdf (last visited on August 11, 2014).

Case No.

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

1
2
3

**Confidentiality of health information:** You should expect to communicate with health care providers in confidence and to have the confidentiality of your health care information protected to the extent permitted by law.  You also should expect to have the ability to review, copy, and request amendments to your medical records.

4   *See* TRICARE's Expectations for Beneficiaries.

5
6
7

36.     Upon information and belief, a portion of the medical and dental insurance premiums paid by Plaintiff and Class Members to TRICARE funded healthcare-related services, such as safeguarding and protecting their PII/PHI.

8
9
10
11
12
13

37.     TRICARE and DOD first contracted with SAIC in 1992 to perform certain services, including safeguarding and protecting PII/PHI received by TRICARE and DOD and entrusted to SAIC – such as Plaintiff's and Class Members' PII/PHI.  As a third-party contractor of TRICARE/DOD, SAIC had (and continues to have) a duty to ensure the confidentiality and privacy of their PII/PHI in accordance with the above-referenced law and protocols.

14
15
16
17
18
19

38.     Indeed, Leidos, Inc. boasts on its website that it "offers security services that help healthcare organizations (HCOs) maintain the confidentiality, integrity, and availability of electronic protected health information (ePHI), meet their compliance mandates, and operate successfully in a highly regulated and increasingly competitive healthcare environment."  *See* https://www.leidos.com/health/healthit/health-information-security (last visited August 13, 2014).  The website further states that:

20
21
22
23
24

Leidos's teams of security specialists have deep knowledge and understanding of the privacy and security policies and technologies needed to enable compliance with the numerous federal statutes and regulations to which HCOs may be subject.  These requirements include the Health Insurance Portability and Accountability Act (HIPAA) Security and Privacy Rules, National Institute of Standards and Technology health IT and security standards and best practices, various financial integrity statutes, and for federal agencies, the Federal Information Security Management Act (FISMA), as well as state and industry data protection requirements and best practices.

25   *Id.* Leidos, Inc. also recognizes that:

26
27
28

Protecting patient data is not only an issue of privacy and confidentiality protection and regulatory compliance for HCOs [Healthcare Organizations], but is also a matter of patient safety. … Protecting the integrity of health data against corruption and guarding its availability and accuracy are critical to safe and effective clinical care. … Data corruption, data breaches and systems

intrusions create patient safety issues and endanger the reputation of the HCO. Our cybersecurity technical capabilities, proven in the national security and defense domains, help our health customers guard precious data and business reputations in an increasingly challenging and competitive world.

*Id.*

39.     Pursuant to the 2004 contract between SAIC and TRICARE/DOD (which was renewed in 2005 and 2006), the PII/PHI of Plaintiff and Class Members, all of whom are third-party beneficiaries of the contract, was required to be safeguarded, protected and kept confidential and private.  Upon information and belief, the standard remained the same for all relevant times:

**6.0  Other Terms, Conditions, and Provisions**.

**Proprietary Information Statement**

The Contractor [SAIC] shall sign one version of the following non-disclosure statement on behalf of the company, only if applicable, and shall also ensure that all staff assigned to, including all subcontractors and consultants, performing on this Delivery Order execute and adhere to the terms of the following non-disclosure statement, protecting the procurement sensitive information of the Government and the proprietary information of other contractors (Deliverable 1).  Assignment of staff who have not executed this statement or failure to adhere to this statement shall continue default on the part of the Contractor.

*Id.* at 18.

**Policy for Information Assurance.**

**General Security Requirements.**   The Contractor [SAIC] shall establish appropriate administrative, technical and physical safeguards to protect any and all Government data, to ensure the confidentiality, integrity, and availability of government data.  As a minimum, this shall include provisions for personnel security, electronic security and physical security as listed in the sections that follow:

Health Insurance Portability and Accountability Act (HIPAA).   *The Contractor shall comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (P.L.104-191) requirements, specifically the administrative simplification provisions of the law and the associated rules and regulations published by the Secretary, Health and Human Services (HHS) and the published TRICARE Management Activity (TMA) implementation directions.  This includes the Standards for Electronic Transactions and the Standards for Privacy of Individually Identifiable Health Information.  It is expected that the contractor shall comply with all HIPAA-related rules and regulations as they are published and as TMA requirements are defined (including security standards, identifiers for providers, employers, health plans, and individuals, and standards for claims attachment transactions).*

*Id.* at 23 (emphasis added).

BLOOD HURST & O'REARDON, LLP

Case No.

**CLASS ACTION COMPLAINT**

00077097

**Special Requirements for Protected Health Information.** Whenever a contract is awarded that will collect, use or store Protected Health Information (PHI) then the contractors must notify the TMA Privacy Office when the contract is awarded. The Contractor shall ensure that data from any DoD AIS which contains PHI is continuously protected from unauthorized access, use, modification, or disclosure. The Contractor shall comply with DoD Directive 8500.1, Information Assurance, Privacy Act Program Requirements (DoD 5400.11), DoD Health Information Privacy Regulation (DoD 6025.18-R) and Personnel Security Program Requirements (5200.2-R).

*Id.* at 28.

*In addition, the Contractor [SAIC] shall employ physical security safeguards for IS/Networks involved in processing or storage of PHI to prevent the unauthorized access, disclosure, modification, destruction, use, etc., and to otherwise protect the confidentiality and ensure use conforms to the terms of an approved DUA.*

*Id.* at 29-30 (emphasis added).

40.     On May 19, 2011, SAIC announced it was awarded a prime contract by DOD to provide information technology services and electronic health records system support to TRICARE. The contract provides for three one-year options, pursuant to which DOD agreed to pay SAIC a total of $53 million, if all options were exercised.

41.     On February 6, 2012, DOD extended the sole-source contract with SAIC to continue the very same duties that, as evidenced by the Data Breach and other security breaches discussed more fully herein, SAIC repeatedly failed to adequately perform. NextGov, a website that monitors technology and government, described the absurdity of the extension:

File this one under irony. Science Applications International Corp., the outfit that jeopardized the health care records of 4.9 million TRICARE beneficiaries when computer tapes containing the data were stolen from an employee's car, just received a sole-source contract to continue supporting the Defense Department core electronic health record system. ... What is unusual is there is no time line and no value given for this extension, a rather glaring omission considering SAIC's poor stewardship of records.

*See* SAIC Wins More TRICARE Business, *available at* http://www.nextgov.com/defense/whats-brewin/2012/02/saic-wins-more-tricare-business/55172/ (last visited August 12, 2014). Experience teaches that absent litigation, SAIC will continue to fail to safeguard and protect the PII/PHI of servicemen and women and their families in perpetuity – including Plaintiff's and Class Members' PII/PHI.

BLOOD HURST & O'REARDON, LLP

15

**B.      DOD and SAIC Knew the DOD's Information Security Systems Were Not Secure.**

42.      In order to safeguard and protect PII/PHI received and maintained by the Federal Government, the GAO and the Federal Information Security Management Act ("FISMA") require each federal agency, including DOD, to submit a report addressing the agency's risk-based approach to agency-wide information security management.  The GAO releases to the public annual scorecards based on the agencies' FISMA reports.

43.      In March 2006, the 2005 FISMA grades were released.  The DOD received a grade of "F," the same grade received by DOD in 2001 and 2002 and down from the FISMA grade of "D" the DOD received in 2004.  *See* March 16, 2006 FISMA Computer Security Report Card.  The March 16, 2006 FISMA Report noted that "[o]ur analysis reveals that the scores for the Departments of Defense . . . remained unacceptably low or dropped precipitously. . . .  If FISMA was the No Child Left Behind Act, a lot of the critical agencies [including the DOD] would be on the list of 'low performers.'  None of us would accept D+ grades on our children's report cards.  We can't accept these either."  Several "areas of concern" for FISMA included "specialized security training for employees with significant security responsibilities" and "agency responsibility for contractors systems."  *Id.*  SAIC knew DOD's information security systems were not secure, yet did not take the steps they were paid to take to secure information for which SAIC was responsible.

**C.      SAIC Has a Long History of Data Security Failures, Data Breaches, and Wrongful PII/PHI Disclosures.**

44.      Since 2005, SAIC has experienced multiple data security failures due to malware infections, stolen computers and, in 2011, the Data Breach at issue here.

45.      For example, on February 12, 2005, SAIC notified 45,000 past and present employees – including top military and intelligence officials – that they were at risk of identity theft after computers containing Social Security numbers, financial transaction records and other sensitive personal information were disclosed during a break-in at SAIC's administration building in San Diego, California.

BLOOD HURST & O'REARDON, LLP

00077097

16

Case No.

CLASS ACTION COMPLAINT

46.    On July 20, 2007, SAIC announced that the Social Security numbers and personal health records of nearly 900,000 servicemen and women, their family members and other government employees – stored on a non-secure computer server – were disclosed and compromised because SAIC failed to encrypt the data before transmitting it online.  Then CEO and Chairman, Ken C. Dahlberg, described the 2007 SAIC security breach as "completely unacceptable."

47.    On January 1, 2008, SAIC notified the Massachusetts Office of the Attorney General that malware had infected a company computer that resulted in credit card information of certain customers being disclosed and compromised.

48.    On June 30, 2010, SAIC notified the Maryland Office of the Attorney General that it had discovered a theft of backup data tapes disclosing sensitive private information, including Social Security numbers, to the world.

49.    SAIC's systemic pattern of security failures and data breaches, exacerbated by DOD's consistently failing FISMA grades, demonstrates SAIC's inability, unwillingness and failure to correct its faulty data protection policies.  SAIC's pattern of willful and intentional disregard of the security of the data in its possession and control, notwithstanding the repeated warnings it has received and repeated embarrassment it has suffered, does not give rise to an assurance that its corporate reincarnations have, or will do, any better.  Such conduct is especially troubling considering SAIC is obligated to protect the PII/PHI of servicemen and women and their families entrusted to it by TRICARE and DOD.

50.    Equally as troubling is the fact that although SAIC repeatedly and continually failed to properly perform its statutory and contractual duties to safeguard and protect PII/PHI entrusted to it – including Plaintiff's and Class Members' PII/PHI – DOD has repeatedly rewarded SAIC with multi-hundred million dollar contracts to provide information technology services and electronic health record system support services.

**D.    The September 2011 Data Breach and Its Wrongful Notification.**

51.    On September 29, 2011, TRICARE published a statement on its website concerning a security breach (the "September 29 Notification").  According to the September

Case No.

00077097

BLOOD HURST & O'REARDON, LLP

1   29 Notification, more than two weeks prior, on September 14, 2011, TRICARE learned that on

2   September 12, 2011, SAIC had experienced a security breach affecting over 4.7 million

3   TRICARE beneficiaries (*i.e.*, Plaintiff and Class Members) who, since 1992, had received

4   medical care or had laboratory work processed through military medical facilities in San

5   Antonio, Texas (*i.e.*, the Data Breach).

6       52.   TRICARE stated that the Data Breach resulted in the disclosure of computer

7   data tapes containing PII/PHI – including Social Security numbers, addresses, phone numbers,

8   dates of birth, and private medical information such as clinical notes, lab tests, prescription

9   information and private health information for patients located nationwide and overseas.

10      53.   Only a portion of the PII/PHI on the data tapes was encrypted, and even then,

11  the level of encryption failed to comply with government standards for strength of

12  cryptographic modules.   At the time of the Data Breach, SAIC did not have a policy

13  mandating that PII/PHI contained on backup data tapes be encrypted in accordance with

14  federal standards and reasonable and accepted business practices.

15      54.   On or about September 29, 2011, Vernon Guidry ("Guidry"), a spokesman for

16  SAIC, confirmed that SAIC, a TRICARE third-party contractor, was the custodian of the

17  PII/PHI when the Data Breach occurred.  Guidry further revealed that the unencrypted backup

18  data tapes were being transported "pursuant to contract requirements" with SAIC at the time.

19      55.   Specifically, on or about September 12, 2011, the backup data tapes, which

20  were being transported by a low level SAIC employee in his personal vehicle, were left

21  unattended in the vehicle for over eight hours in downtown San Antonio.

22      56.   A thief or thieves broke into the SAIC employee's vehicle, which had no

23  special protections for the information, and took the unencrypted backup data tapes, thereby

24  gaining information worth millions of dollars, which the thief or thieves subsequently sold,

25  transferred, opened, read, mined, and otherwise used without Plaintiff's and Class Members'

26  authorization.

27

28

BLOOD HURST & O'REARDON, LLP

18                                          Case No.

**CLASS ACTION COMPLAINT**

57.    Upon information and belief, prior to entrusting the employee with transporting the data tapes, SAIC did not perform a background security check on the employee, nor train the employee in data security and transportation procedures as mandated by federal law.

58.    SAIC subsequently placed the employee on administrative leave.  According to Guidry, "it was his job to transfer tapes in an expeditious manner between facilities; that's all we're going to say at this point."  Although Guidry did not state whether the employee violated an SAIC internal policy by leaving the data tapes in his car, he acknowledged, "if they weren't in his car, they wouldn't be stolen."

59.    According to Sean Glynn, marketing vice president for Credant Technologies, a data security firm in Addison, Texas, an armored vehicle should be used to transport large amounts of confidential and sensitive data – such as Plaintiff's and Class Members' PII/PHI.

60.    Equally as important, Plaintiff's and Class Members' PII/PHI contained on the data tapes was either unencrypted or partially encrypted, but even then, not pursuant to federal standards or industry best practices.  SAIC further revealed the computer system that generated the data tapes was incapable of encrypting the tapes pursuant to federal standards and industry best practices of PII/PHI technologies and management.

61.    On information and belief, while Plaintiff's and Class Members' PII/PHI was in its possession, custody, and control, SAIC routinely (i) failed to properly encrypt data tapes and other electronic data, (ii) hired unverified, untrained and/or improperly trained individuals and gave them access to such PII/PHI, and (iii) allowed unverified, untrained and/or improperly trained individuals to remove such PII/PHI from SAIC's premises and transport such PII/PHI in their unarmored personal vehicles without the protection of an armed guard and/or other security precautions mandated by law and/or industry best practices.

62.    SAIC knew about such data security failures as early as March 2006 when the GAO gave the DOD a FISMA grade of "F" and noted several "areas of concern" for DOD – including the need for "specialized security training for employees with significant security responsibilities" and "agency responsibility for contractors systems."

BLOOD HURST & O'REARDON, LLP

**CLASS ACTION COMPLAINT**

63.     The Data Breach was a direct and/or proximate result of SAIC's ongoing failure to implement and maintain appropriate and reasonable security procedures and practices to safeguard and protect Plaintiff's and Class Members' PII/PHI from unauthorized access, destruction, use, modification and/or disclosure, as required by various state regulations and industry practices.  SAIC's failures include, *inter alia*:

(i)     the failure to implement and maintain written policies and procedures that clearly identify the employees or classes of employees with authorized access to PII/PHI;

(ii)    the failure to implement and maintain written policies and procedures to ensure that access to hardware and software containing PII/PHI is controlled and monitored;

(iii)   the failure to implement and maintain written policies and procedures to ensure that employees with access to hardware and software containing PII/PHI are authorized and authenticated prior to gaining access to the PII/PHI;

(iv)    the failure to implement and maintain written policies and procedures requiring employees to be trained on hardware and software access responsibilities;

(v)     the failure to implement and maintain written policies and procedures for the security of facilities housing PII/PHI, including proper surveillance, entry control, maintenance records and visitor sign-in and escorts;

(vi)    the failure to implement and maintain written policies and procedures to ensure that information systems utilize encryption for both open and closed systems/networks;

(vii)   the failure to implement and maintain written policies and procedures to ensure data integrity of PII/PHI, such as the use of check sum, double-keying, message authentication, and digital signatures;

(viii)  the failure to implement and maintain written policies and procedures for recording and examining activity (system events and logs) in information systems containing or using PII/PHI; and

(ix)    the failure to otherwise safeguard and protect Plaintiff's and Class Members' PII/PHI.

64.     SAIC is, or should be, aware of recurring, systemic and fundamental deficiencies in its information security systems, policies, and procedures, but failed and refused to remedy the situation and properly safeguard and protect PII/PHI in its possession, custody, and control – including Plaintiff's and Class Members' PII/PHI.  SAIC's repeated failure to correct known vulnerabilities in its information security systems, policies, and

BLOOD HURST & O'REARDON, LLP

00077097

procedures demonstrates an intentional and/or reckless disregard for Plaintiff's and Class Members' protected privacy rights.

**E.    SAIC's Inadequate Post-Data Breach Disclosure Response.**

65.    According to TRICARE's February 1, 2008 Operations Manual, TRICARE and its contractors, including SAIC:

> [S]hall inform affected individuals whenever they become aware that protected personal information pertaining to a Service member, civilian employee, military retiree, family member, or another individual affiliated with [DOD] has been lost, stolen or compromised.   Notification will take place as soon as possible, *but not later than ten days after the loss or compromise of protected personal information is discovered.*

(emphasis added).  Despite this policy, SAIC did not provide any information whatsoever to Plaintiff and Class Members until the September 29 Notification, fifteen days after discovering the Data Breach.  Even then, the September 29 Notification was not specifically targeted to Plaintiff and Class Members, but rather, to the public at large via a website that Plaintiff and Class Members were not notified to read.  Specific notification to Plaintiff and Class Members did not occur until several weeks later.

66.    The September 29 Notification was not only untimely and inadequate, it was woefully deficient.  The information provided was obscurely displayed on the TRICARE website, and only vaguely explained the details of the Data Breach and the persons affected. The September 29 Notification was also materially misleading, stating that the reason for delaying notification to affected TRICARE members was because TRICARE "… did not want to raise undue alarm in our beneficiaries."  The website of SAIC was silent.  During November 2011, two months after the Data Breach, SAIC began mailing letters to Class Members notifying them that their PII/PHI, in fact, had been disseminated to the world via the Data Breach (the "SAIC Letters").  Unfortunately, notice via the SAIC Letters was also inadequate as a large number of Class Members did not receive the letters, and could only confirm they were victims of the Data Breach by contacting SAIC directly.

67.    Plaintiff and Class Members had no special or mandated reason to check their financial accounts and credit reports for suspicious activity arising from the Data Breach

**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

00077097

during this intervening period. Additionally, SAIC's "notice" to Plaintiff and Class Members squarely placed the burden on them, rather than it, to investigate and protect themselves from the heretofore undisclosed Data Breach.

68. The SAIC Letters also are materially misleading. The SAIC Letters, which are uniform except for the addressees, advised the recipients that "[t]he chance that your information could be obtained from these tapes is low … ." SAIC, however, subsequently admitted that the data on the tapes was improperly encrypted or not encrypted at all. That said, the purloined PII/PHI was easily available to motivated criminals and users of the illicitly published information – as demonstrated by Plaintiff's experiences set forth above.

69. The September 29 Notification on TRICARE's website also was materially misleading, stating that the reason for delaying notification to affected TRICARE members was because TRICARE "… did not want to raise undue alarm in our beneficiaries … ." Categorizing the risk of access as "low" and not wanting "to raise undue alarm" were misleading statements in light of the actual and ongoing risk of identity theft, identity fraud and medical fraud experienced by Plaintiff and Class Members since their PII/PHI has now been disclosed, sold, transferred, opened, read, and otherwise used without their authorization.

70. The SAIC Letters also directed Plaintiff and Class Members to take several steps to protect themselves in response to the Data Breach. Unfortunately, many of these steps required them to incur additional out-of-pocket expenses. For example, a victim of the Data Breach who placed a "security freeze" on his or her credit report, an option described in the SAIC Letters, incurred an out-of-pocket cost of at least $5.00. Monitoring one's credit reports, another option described in the SAIC Letters, would cause a Data Breach victim to incur an expense to see his or her credit reports beyond the one free annual report to which they are entitled. In short, enrolling in monitoring programs and/or purchasing identity theft insurance over and above the one year of credit monitoring offered by SAIC directly and/or proximately resulted in Plaintiff and Class Members suffering economic damages and other injury and harm.

BLOOD HURST & O'REARDON, LLP

71.     SAIC's wrongful actions, inaction, and omissions in failing to timely, completely and accurately notify Plaintiff and Class Members about the Data Breach and corresponding unauthorized disclosure of their PII/PHI, were arbitrary, capricious and in derogation of its duties to Plaintiff and Class Members and the notification procedures required by law.

72.     SAIC initially did not offer any direct assistance to Plaintiff and Class Members pertaining to the Data Breach, nor did SAIC explain any steps being taken to protect against future wrongful disclosures of Plaintiff's and Class Members' PII/PHI.   Thereafter, in November 2011, however, TRICARE and DOD directed SAIC to provide one year of free identity theft monitoring to all affected persons.

73.     The "protection" offered by SAIC, however, was woefully inadequate because, *inter alia*:

(i)     SAIC offered only a single bureau credit monitoring program – as opposed to the industry recommended triple bureau program – that provided no protection to minors.  Each minor child victim continues to be fully exposed to damages;

(ii)    SAIC did not provide any protection against medical identity theft and fraudulent health insurance claims, the victims of which are often left with huge medical bills, damaged credit, public disclosure of their medical condition and erroneous medical records.  According to a September 2011 report by PwC's Health Resource Institute "Old Data Learns New Tricks," the problem of medical identity theft is worsening and is the fastest growing form of identity theft.  Old Data Learns New Tricks, *available at* http://www.pwc.com /us/ /health-industries/publications/old-data-learns-new-tricks.jhtml   (last   visited August 12, 2014); and

(iii)   It was offered by SAIC for only one year.  As reported by the FTC, however, a person impacted by identity theft should take proactive steps well after a year has passed to protect against identity theft and related risks as experts have found that data thieves typically hold stolen data for over a year before using it and/or re-selling it.

74.     Had SAIC complied with its own policies and procedures, as well as state and federal data breach notification statutes and guidelines and industry best practices, SAIC would have swiftly notified Plaintiff and Class Members about the Data Breach within ten days of learning of the incident – thereby affording Plaintiff and Class Members with the timely opportunity to mitigate their economic damages, injury and harm.

BLOOD HURST & O'REARDON, LLP

**F.    The Injury and Harm SAIC Perpetrated on Plaintiff and Class Members.**

75.    SAIC flagrantly disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by not obtaining Plaintiff's and Class Members' prior written consent to disclose their PII/PHI to any other person or government agency – as required by HIPAA, HITECH, the California CMIA, and other pertinent laws, regulations, industry standards and/or internal company standards.

76.    SAIC flagrantly disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by failing to safeguard and protect and, in fact, wrongfully disseminating their PII/PHI to the world.

77.    SAIC flagrantly disregarded and violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by failing to keep or maintain an accurate accounting of the PII/PHI wrongfully disclosed in the Data Breach.

78.    SAIC flagrantly disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by failing to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of their PII/PHI to protect against anticipated threats to the security or integrity of such information.  SAIC's security deficiencies allowed, and continue to allow, a single individual to access, remove from SAIC's premises, transport, disclose and/or compromise the PII/PHI of millions of United States citizens – including, without limitation, Plaintiff and Class Members.  SAIC's unwillingness or inability to establish and maintain the proper information security procedures and controls is an abuse of discretion and confirms their intentional and willful failure to observe procedures required by law, industry standards and/or their own internal policies and procedures.

79.    SAIC flagrantly disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by failing to accurately, completely, and timely notify and inform them about the Data Breach and corresponding loss of their PII/PHI within the ten-day period mandated by SAIC's internal policies and procedures and California laws

BLOOD HURST & O'REARDON, LLP

80.    SAIC's untimely and inadequate notification – including its failure to provide Plaintiff and Class Members with any meaningful protection or relief from the Data Breach – substantially increased Plaintiff's and Class Members' risk of identity theft, identity fraud and/or medical fraud.

81.    Identity theft occurs when a person's personally identifying information, such as that person's name, Social Security number, or credit card number is used without his/her permission to commit fraud or other crimes. *See* Federal Trade Commission, Take Charge: Fighting Back Against Identity Theft, available at http://www.bbb.org/us/article/ftc--take-charge-fighting-back-against-identity-theft-4791 (last visited September 21, 2014).[10]

82.    According to the FTC, "the range of privacy-related harms is more expansive than economic or physical harm or unwarranted intrusions and that any privacy framework should recognize additional harms that might arise from unanticipated uses of data."[11] Furthermore, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[12]

83.    According to the 2012 Javelin Report, in 2011, the mean consumer cost of rectifying identity fraud was $354 while the mean resolution time of identity fraud was 12 hours. *Id.* at 6.  In 2011, the consumer cost for new account fraud and existing non-card fraud increased 33% and 50% respectively. *Id.* at 9.  Consumers who received a data breach

---

[10]    According to the FTC, "Identity theft is serious.  While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record.  Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports.  In rare cases, they may even be arrested for crimes they did not commit." *Id.*

[11]    *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers,* FTC Report (March 2012), available at http://www.ftc.gov/reports/protecting-consumer-privacy-era-rapid-change-recommendations-businesses-policymakers (last visited September 21, 2014).

[12]    *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers*, FTC Preliminary Staff Report (Dec. 2010), available at http://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework (last visited September 21, 2014); *Comment of Center for Democracy & Technology,* cmt. #00469, at 3; *Comment of Statz, Inc.*, cmt. #00377, at 11-12.

Case No.

CLASS ACTION COMPLAINT

1  notification had a fraud incidence rate of 19% in 2011 and, of those experiencing fraud, 43%

2  reported their credit card numbers were stolen and 22% of the victims reported their debit card

3  numbers were stolen. *Id.* at 10. More important, consumers who were notified that their

4  PII/PHI had been breached were 9.5 times more likely to experience identity fraud than

5  consumers who did not receive such a notification. *Id.* at 39.

6        84. A person whose personal information has been compromised may not see any

7  signs of identity theft for *years*. According to the GAO's June 2007 report on Data Breaches:

8       [L]aw enforcement officials told us that in some cases, stolen data may be held
9       for up to a year or more before being used to commit identity theft. Further,
        once stolen data have been sold or posted on the Web, fraudulent use of that
10      information may continue for years. *As a result, studies that attempt to
        measure the harm resulting from data breaches cannot necessarily rule out all
11      future harm.*

12 *Id.* (emphasis added).

13       85. PII/PHI is such a valuable commodity to identity thieves that once the

14 information has been compromised, criminals often trade the information on the "cyber black-

15 market" for a number of years. Identity thieves and other cyber criminals openly post

16 wrongfully disclosed credit card numbers, Social Security numbers and other PII/PHI directly

17 on various Internet websites, thereby making the information publicly available. In one study,

18 researchers found hundreds of websites displaying stolen PII/PHI. Strikingly, none of these

19 websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

20 The study concluded:

21      It is clear from the current state of the credit card black-market that cyber
        criminals can operate much too easily on the Internet. They are not afraid to
22      put out their email addresses, in some cases phone numbers and other
        credentials in their advertisements. It seems that the black market for cyber
23      criminals is not underground at all. In fact, it's very "in your face."

24 http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/ (last

25 visited September 21, 2014).

26       86. "[H]ealth information is far more valuable than Social Security numbers" on the

27 cyber black market according to Dr. Deborah Peel, founder and chairwoman of Patient Privacy

28

BLOOD HURST & O'REARDON, LLP

26                          Case No.

**CLASS ACTION COMPLAINT**

Rights.[13]   For example, an ABC News search uncovered one internet seller offering medical record database dumps for $14 to $25 per person.  ABC News was then sent, unsolicited, 40 individuals' PHI, including their names, addresses and body mass index.  Another inquiry yielded an offer of more than 100 records including everything from Social Security numbers to whether someone suffered from anxiety, hypertension, and their HIV status.  Plaintiff's and Class Members' PII/PHI has been (and similarly could be) valued and traded on the cyber black market.

87.   SAIC flagrantly disregarded and violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by depriving them of the value of their PII/PHI, for which there is a well-established national and international market.  *See, e.g.,* Soma, *supra* ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

88.   Aside from the criminal element, frequent purchasers of purloined PHI include pharmacies, drug manufacturers, medical device manufacturers, hospitals and insurance companies who use the information to market their products and services directly to the data breach victims and/or to adjust the victims' medical insurance premiums.  *Id.*  Plaintiff and Class Members, not data thieves, should have the right to sell their PII/PHI and receive the corresponding financial benefits.

89.   The actual harm and adverse effects to Plaintiff and Class Members, including the imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly and/or proximately caused by SAIC's above wrongful actions, inaction, and omissions, and the resulting Data Breach, requires Plaintiff and Class Members to take affirmative acts to recover their peace of mind, and personal security, including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, and/or closing or

---

[13]   http://abcnews.go.com/Health/medical-records-private-abc-news-investigation/story?id=17228986&page=2#.UGRgtq7yBR4 (last visited September 21, 2014).

**CLASS ACTION COMPLAINT**

Case No.

BLOOD HURST & O'REARDON, LLP

00077097

1    modifying financial accounts – for which there is a financial and temporal cost.  Plaintiff and

2    Class Members have suffered, and will continue to suffer, such economic damages, injury

3    and/or harm for the foreseeable future.

4         90.    As a direct and/or proximate result of SAIC's above wrongful actions, inaction,

5    and/or omissions, and the resulting Data Breach, Plaintiff and Class Members also received a

6    diminished value of the services they paid TRICARE to provide.   Upon information and

7    belief, a portion of Plaintiff's and Class Members' payments for health and/or dental insurance

8    premiums and/or other health care products, services, and medications was for healthcare-

9    related services, such as data management and data security.   Plaintiff and Class Members

10   contracted for an insurance plan that included SAIC's guaranty to safeguard and protect their

11   PII/PHI, but instead, received a plan devoid of these important protections.  Despite failing to

12   implement or inadequately implementing policies to safeguard and protect their PII/PHI, SAIC

13   has had the beneficial use and enjoyment of the full amount of such payments.

14        91.    Victims and potential victims of identity theft, identity fraud and/or medical

15   fraud – such as Plaintiff and Class Members – typically spend hundreds of hours in personal

16   time and hundreds of dollars in personal funds to resolve credit and other financial issues

17   resulting from data breaches.  *See Fight Identity Theft*, www.fightidentitytheft.com (last visited

18   September 21, 2014).  According to the 2012 Javelin Report, not only is there a substantially

19   increased risk of identity theft and identity fraud for data breach victims, those who are further

20   victimized by identity theft or identity fraud will incur an average fraud-related economic loss

21   of $1,513 and incur an average of $354 of out-of-pocket expenses attempting to rectify the

22   situation.  *Id*. at 6.

23        92.    Other statistical analyses are in accord.  The GAO found that identity thieves

24   use PII/PHI to open financial accounts and payment card accounts and incur charges in a

25   victim's name.  This type of identity theft is the "most damaging" because it may take some

26   time for the victim to become aware of the theft, in the meantime causing significant harm to

27   the victim's credit rating and finances.  Moreover, unlike other PII/PHI, Social Security

28

BLOOD HURST & O'REARDON, LLP

1   numbers are incredibly difficult to change and their misuse can continue for years into the

2   future.

3       93.     Identity thieves also use Social Security numbers to commit other types of

4   fraud, such as obtaining false identification cards, obtaining government benefits in the

5   victim's name, committing crimes and/or filing fraudulent tax returns on the victim's behalf to

6   obtain fraudulent tax refunds.  Identity thieves also obtain jobs using wrongfully disclosed

7   Social Security numbers, rent houses and apartments and/or obtain medical services in the

8   victim's name.  Identity thieves also have been known to give a victim's personal information

9   to police during an arrest, resulting in the issuance of an arrest warrant in the victim's name

10  and an unwarranted criminal record.  The GAO states that victims of identity theft face

11  "substantial costs and inconvenience repairing damage to their credit records," as well the

12  damage to their "good name."

13      94.     The unauthorized disclosure of a person's Social Security number can be

14  particularly damaging since Social Security numbers cannot be easily replaced like a credit

15  card or debit card.  In order to obtain a new Social Security number, a person must show

16  evidence that someone is using the number fraudulently or is being disadvantaged by the

17  misuse.  *See Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064

18  (October 2007, ICN 46327), available at http://www.ssa.gov/pubs/10064.html (last visited

19  September 21, 2014).  Thus, a person whose PII/PHI has been wrongfully disclosed cannot

20  obtain a new Social Security number until the damage has already been done.

21      95.     Obtaining a new Social Security number also is not an absolute prevention

22  against identity theft.  Government agencies, private businesses and credit reporting companies

23  likely still have the person's records under the old number, so using a new number will not

24  guarantee a fresh start.  For some victims of identity theft, a new number may actually create

25  new problems.  Because prior positive credit information is not associated with the new Social

26  Security number, it is more difficult to obtain credit due to the absence of a credit history.

27      96.     Medical identity theft (or medical fraud) occurs when a person's personal

28  information is used without authorization to obtain, or receive payment for, medical treatment,

BLOOD HURST & O'REARDON, LLP

29

Case No.

**CLASS ACTION COMPLAINT**

1    services or goods. For example, as of 2010, more than 50 million people in the United States

2    did not have health insurance according to the U.S. census. This, in turn has led to a surge in

3    medical identity theft as a means of fraudulently obtaining medical care.

4          97.    SAIC's wrongful actions, inaction, and/or omissions directly and/or

5    proximately caused the "double Holy Grail of data breaches" – the theft and dissemination into

6    the public domain of Plaintiff's and Class Members' PII/PHI without their knowledge,

7    authorization and/or consent. As a direct and/or proximate result of SAIC's wrongful actions,

8    inaction, and/or omissions, and the resulting Data Breach, Plaintiff and Class Members have

9    incurred (and will continue to incur) economic damages and other injury and harm in the form

10    of, *inter alia*, (i) actual identity theft, identity fraud and/or medical fraud, (ii) invasion of

11    privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the

12    California CMIA, (v) lost benefit of their bargains, (vi) deprivation of the value of their

13    PII/PHI, for which there is a well-established national and international market, (vii)

14    diminished value of the healthcare products, medical insurance and/or medical services they

15    purchased from the Federal Government (*i.e.*, TRICARE), and/or (viii) an imminent,

16    immediate and/or continuing increased risk of identity theft, identity fraud and/or medical

17    fraud – for which they are entitled to compensation.

18                               **CLASS ACTION ALLEGATIONS**

19          98.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this

20    action against SAIC as a class action on behalf of themselves and all members of the following

21    class of similarly situated individuals:

22       All natural persons who resided in California on September 12, 2011, whose
         Social Security numbers, addresses, telephone numbers, medical diagnoses,

23       medical treatment information, health care provider names and locations,
         clinical notes, lab test results, prescription information, and other highly

24       confidential and private personally identifying information and personal health
         information (PII/PHI) was disclosed without their authorization in the SAIC

25       Data Breach.

26          99.    Excluded from the Class are SAIC, any entity in which any SAIC has a

27    controlling interest, SAIC's officers, directors, agents and legal representatives, and the Court

28    and Court personnel.

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

100.    The Class Members are so numerous that their joinder is impracticable. According to information provided by SAIC, there are over 200,000 Class Members.   The precise identities and addresses of the Class Members are currently unknown to Plaintiff, but can be derived from SAIC's internal records that were used to send the SAIC Letters formally notifying them of the Data Breach.

101.    The rights of Plaintiff and each Class Member were violated in a virtually identical manner as a result of SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI.

102.    There are questions of law and fact common to the Class as a whole.   The common questions of law and fact predominate over any questions affecting only individual members of the Class and include, without limitation:

(i)     Whether SAIC adequately designed, adopted, implemented, controlled, directed, oversaw, managed, monitored and/or audited the appropriate data security processes, controls, policies, procedures and/or protocols to safeguard and protect Plaintiff's and Class Members' PII/PHI disclosed without authorization in the Data Breach;

(ii)    Whether SAIC failure to properly safeguard and protect Plaintiff's and Class Members' PII/PHI was willful, reckless, arbitrary, capricious and/or otherwise not in accordance with the applicable protocols, procedures, guidelines, laws and/or regulations;

(iii)   Whether SAIC failed to inform Plaintiff and Class Members of the Data Breach and the unauthorized disclosure of their PII/PHI in a manner, and within the time period, required by its own internal policies and procedures and/or the applicable laws;

(iv)    Whether SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI violated the California CMIA;

(v)     Whether SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI constitutes the violation of California Unfair Competition Law;

(vi)    Whether SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI constitutes assumpsit at California common law;

(vii)   Whether Plaintiff and Class Members suffered harm or injury as a direct and/or proximate result of SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI; and

00077097

(viii)   Whether Plaintiff and Class Members suffered damages as a direct and/or proximate result of SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI and, if so, the amount of such damages.

103.   Plaintiff's claims are typical of the claims of the Class Members because Plaintiff, like all Class Members, are victims of SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach, caused the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI, and caused Plaintiff and Class Members to suffer the resulting economic damages, injury and harm.

104.   Plaintiff and his counsel will fairly and adequately represent the interests of the Class Members.  Plaintiff has no interests antagonistic to, or in conflict with, any of the Class Members' interests.  Plaintiff's lawyers are highly experienced in the prosecution of complex commercial litigation, consumer class actions, and data breach cases.

105.   A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiff's and Class Members' claims.  Plaintiff and Class Members have been irreparably harmed as a result of SAIC's wrongful actions and/or inaction that caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI.  Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Class Members to intervene as parties-plaintiff in this action, (iii) it will allow numerous individuals with claims too small to adjudicate on an individual basis because of prohibitive litigation costs to obtain redress for their injuries, and (iv) it will provide court oversight of the claims process once SAIC's liability is adjudicated.

106.   Certification of the Class, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

107.   Certification of the Class also is appropriate under FED. R. CIV. P. 23(b)(2) because SAIC has acted or refused to act on grounds generally applicable to the Class, thereby

Case No.

00077097

BLOOD HURST & O'REARDON, LLP

1    making appropriate final injunctive relief and/or equitable relief with respect to the Class as a

2    whole.

3        108.    Certification of the Class also is appropriate under FED. R. CIV. P. 23(b)(1)

4    because the prosecution of separate actions by individual Class Members would create a risk of

5    establishing incompatible standards of conduct for SAIC.  For example, one court might

6    decide the challenged wrongful actions, inaction, and/or omissions are illegal and enjoin

7    SAIC, while another court might decide that the same wrongful actions, inaction, and/or

8    omissions are not illegal.  Individual actions also could be dispositive of the interests of the

9    other Class Members who were not parties to such actions and substantially impair or impede

10   their ability to protect their interests.

11       109.    SAIC's wrongful actions, inaction, and/or omissions that directly and/or

12   proximately caused the Data Breach are generally applicable to the Class as a whole, and

13   Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

14       110.    SAIC's systemic policies and practices also make declaratory relief with respect

15   to the Class as a whole appropriate.

16       111.    Absent a class action, SAIC will retain the benefits of its wrongdoing despite its

17   serious violations of the law and infliction of economic damages, injury and harm on Plaintiff and

18   Class Members.

19                          **CLAIMS AND CAUSES OF ACTION**

20                                    **COUNT I**

21       **VIOLATION OF CAL. CONFIDENTIALITY OF MEDICAL INFORMATION ACT**

22                        **(California Civil Code §56, *et seq.*)**

23       112.    The preceding factual statements and allegations are incorporated by reference.

24       113.    California Civil Code §56.10 provides that "[n]o provider of health care, health

25   care service plan, or contract shall disclose medical information regarding a patient of the

26   provider of health care or an enrollee or subscriber of a health care plan without first obtaining

27   authorization."

28

BLOOD HURST & O'REARDON, LLP

1    114.   At all relevant times, pursuant to California Civil Code §56.06(a), SAIC was

2    both a contractor and a health care provider under California law because it had the "purpose

3    of maintaining medical information in order to make the information available to the patient or

4    to a provider of health care at the request of the patient or a provider of health care, for

5    purposes of diagnosis or treatment of the patient."   In particular, SAIC is a privately

6    incorporated business that works to "enable healthcare organizations to manage large volumes

7    of data across multiple enterprises."

8    115.   At all relevant times, SAIC collected, stored, managed and transmitted

9    Plaintiff's and Class Members' PII/PHI and made such information available to TRICARE

10   upon request.

11   116.   California Civil Code §56, *et seq.*, requires SAIC to implement and maintain

12   standards of confidentiality with respect to all individually identifiable PHI disclosed to it.

13   Specifically, California Civil Code §56.10(a) prohibits SAIC from disclosing Plaintiff's and

14   Class Members' PHI without first obtaining the appropriate authorization to do so.

15   117.   California Civil Code §56.11 specifies the manner by which authorization must

16   be obtained by providers of health care before PHI is released.   SAIC failed to obtain proper

17   authorization before releasing Plaintiff's and Class Members' PHI and failed to adopt and

18   maintain the requisite protective procedures required by California law.   As a direct and/or

19   proximate result of SAIC's wrongful actions, inaction, and/or omissions, Plaintiff's and Class

20   Members' PHI was wrongfully disclosed to the world.   As described in detail above, the

21   wrongfully disclosed and compromised PHI was transferred, sold, opened, read, mined and

22   otherwise used without Plaintiff's and Class Members' authorization.   By disclosing Plaintiff's

23   and Class Members' PHI in this manner without their written authorization and subjected their

24   PHI to being transferred, sold, opened, read, mined and otherwise used without authorization,

25   SAIC violated California Civil Code §56, *et seq.* and its legal duty to protect the

26   confidentiality of such information.

27   118.   SAIC also violated Sections 56.06 and 56.101 of the California CMIA, which

28   prohibits the negligent creation, maintenance, preservation, storage, abandonment, destruction

or disposal of confidential PHI. As a direct and/or proximate result of SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach, Plaintiff's and Class Members' confidential PHI was wrongfully released and disclosed.

119. As a direct and/or proximate result of SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach, Plaintiff and Class Members have suffered (and continue to suffer) economic damages and other injury and harm in the form of, *inter alia*, (i) actual identity theft, identity fraud and/or medical fraud, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) lost benefit of their bargains, (v) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, (vi) diminished value of the healthcare products, medical insurance and/or medical services they purchased from TRICARE, and/or (vii) an imminent, immediate and/or continuing increased risk of identity theft, identity fraud and/or medical fraud – for which they are entitled to compensation.

120. Pursuant to California Civil Code §§56.35 and 56.36(b)(1), Plaintiff and Class Members also are entitled to appropriate injunctive and declaratory relief against SAIC, an award of statutory liquidated damages of $1,000 to Plaintiff and each Class Member, punitive damages of up to $3,000 for Plaintiff and each Class Member, attorneys' fees, litigation expenses and court costs.

## COUNT II

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

#### (California Business & Professions Code §17200 *et seq.*)

121. The preceding factual statements and allegations are incorporated by reference.

122. The California Unfair Competition Law, California Business & Professions Code §17200, *et seq.* ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By reason of the wrongful actions, inaction, and/or omissions alleged herein, SAIC engaged in unlawful, unfair and fraudulent practices within the meaning of the UCL.

123.     As a direct and/or proximate result of SAIC's wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach, Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and harm in the form of, *inter alia*, (i) the loss of their PII/PHI, (ii) monies to which they are entitled by virtue of SAIC's violations of the California CMIA, and (iii) costs incurred to protect against the use of and mitigate the loss of the unlawful or unauthorized use of their confidential PII/PHI.

124.     In the course of conducting business, SAIC committed "unlawful" business practices by, *inter alia*, failing to provide and/or take reasonable security measures for the collection, storage and transmission of Plaintiff's and Class Members' PII/PHI, violating the statutory and common law alleged herein, including the California CMIA.  Plaintiff and Class Members reserve the right to allege other violations of law that constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

125.     SAIC also violated the UCL by failing to immediately notify Plaintiff and Class Members of the wrongful disclosure of their PII/PHI.  If Plaintiff and Class Members had been notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII/PHI, finances, and identities.

126.     SAIC's wrongful actions and/or inaction, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices, within the meaning of CAL. BUS. & PROF. CODE §17200 *et seq.*, in that SAICs conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous, and the gravity of SAIC's wrongful conduct outweighs any alleged benefits attributable to such conduct.  There were reasonably available alternatives to further SAIC's legitimate business interests other than the wrongful conduct described herein.

127.     CAL. BUS. & PROF. CODE §17200 also prohibits any "fraudulent business act or practice."  SAIC's above-described nondisclosures and misleading statements were false, misleading and/or likely to deceive the consuming public and violated the statute.

BLOOD HURST & O'REARDON, LLP

1    128.    SAIC's wrongful actions, inaction, and/or omissions, and the resulting Data

2  Breach, directly and/or proximately caused (and continues to cause) the above-described

3  substantial economic damages and other injury and harm to Plaintiff and Class Members.

4  SAIC has wrongfully disclosed sensitive data (*i.e.*, PII/PHI) entrusted to it on multiple prior

5  occasions.   Unless restrained and enjoined, SAIC will continue to engage in the above-

6  described wrongful conduct.

7    129.    Plaintiff, on behalf of himself, Class Members and the general public, also

8  seeks restitution, an injunction prohibiting SAIC from continuing such wrongful conduct and

9  requiring SAIC to take further actions to protect Plaintiff's and Class Members' PII/PHI, and

10  all other relief this Court deems just, proper, and consistent with CAL. BUS. & PROF. CODE

11  §17203.

12                              **COUNT III**

13                              **ASSUMPSIT**

14    130.    The preceding factual statements and allegations are incorporated by reference.

15    131.    By its above-described wrongful actions, inaction, and/or omissions that

16  directly and/or proximately caused the Data Breach – to wit, SAIC's failure to identify,

17  implement, maintain and monitor the proper data security measures, policies, procedures,

18  protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class

19  Members' PII/PHI – SAIC holds money conferred on it by Plaintiff and Class Members, *i.e.*,

20  that portion of the purchase prices they paid TRICARE and/or SAIC for health insurance,

21  healthcare products and/or healthcare services allocable to the protection of their PII/PHI that

22  SAIC admittedly failed to do.  SAIC has been (and continues to be) unjustly enriched by the

23  funds it should have spent to safeguard and protect Plaintiff's and Class Members' PII/PHI

24  that SAIC otherwise pocketed that, in equity and good conscience, belongs to Plaintiff and

25  Class Members, and should be refunded because SAIC failed to protect their PII/PHI.

26    132.    SAIC also continues to be unjustly enriched by, *inter alia*, (i) the saved cost of

27  implementing the proper PII/PHI security measures, policies, procedures, protocols, and

28  software and hardware systems in its computer system and servers, which it did not

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

implement, (ii) the shifted risk and expense of the Data Breach to Plaintiff and Class Members, and (iii) the return on investment on all above-described amounts.

133.　SAIC, therefore, should be compelled to refund (or disgorge) such wrongfully collected, saved back and/or shifted funds and expenses under the California common law equitable doctrine of assumpsit.

**RELIEF REQUESTED**

134.　The preceding factual statements and allegations are incorporated by reference.

135.　**MONETARY RELIEF.**  As a direct and/or proximate result of SAIC's above-described wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach, Plaintiff and Class Members suffered (and continue to suffer) economic damages and other injury and harm in the form of, *inter alia,* (i) actual identity theft, identity fraud and/or medical fraud, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the California CMIA, (v) lost benefit of their bargains, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, (vii) diminished value of the healthcare products, medical insurance and/or medical services they purchased from the Federal Government, and/or (viii) an imminent, immediate and/or continuing increased risk of identity theft, identity fraud and/or medical fraud – for which they are entitled to compensation.  Plaintiff's and Class Members' damages were foreseeable by SAIC and exceed the minimum jurisdictional limits of this Court.  All conditions precedent to Plaintiff's and Class Members' claims have been performed and/or occurred.  Plaintiff and the Class Members are also entitled to restitution of the portion of payments made to SAIC to safeguard their PII/PHI.  Finally, Plaintiff and the Class Members are entitled to statutory damages pursuant to Cal. Civ. Code §56.36.

136.　**PUNITIVE DAMAGES.**  Plaintiff and Class Members also are entitled to punitive damages pursuant to Cal. Civ. Code §56.35 from SAIC as punishment and to deter such wrongful conduct in the future.  All conditions precedent to Plaintiff's and Class Members' claims have been performed and/or occurred.

Case No.

**CLASS ACTION COMPLAINT**

00077097

1

2

3

4

5

6

7

8

9

10

BLOOD HURST & O'REARDON, LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

137.   **INJUNCTIVE RELIEF.**  Plaintiff and Class Members also are entitled to injunctive relief in the form of, *inter alia*, without limitation, (i) credit monitoring, (ii) internet monitoring, (iii) identity theft insurance, (iv) periodic compliance audits by a third party to insure that SAIC is properly safeguarding and protecting the PII/PHI in its possession, custody and control, and (v) clear and effective notice to Class Members about the serious risks posed by the theft of the PII/PHI and the precise steps that must be taken to protect themselves.  All conditions precedent to Plaintiff's and Class Members' claims for relief have been performed and/or occurred.

138.   **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**  Plaintiff and Class Members also are entitled to recover their attorneys' fees, litigation expenses and court costs in prosecuting this action pursuant to, *inter alia*, the applicable California statutes set forth above. All conditions precedent to Plaintiff's and Class Members' claims for relief have been performed and/or occurred.

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, respectfully requests that (i) this action be certified as a class action, (ii) Plaintiff be designated the Class Representative, and (iii) Plaintiff's Counsel be appointed as Class Counsel.  Plaintiff, on behalf of himself and Class Members, further requests that upon final trial or hearing, judgment be awarded against SAIC for:

(i)      actual, consequential, and/or nominal damages to be determined by the trier of fact;

(ii)     statutory damages as set forth above

(iii)    restitution;

(iv)    punitive damages as set forth above;

(v)     pre- and post-judgment interest at the highest legal rates applicable;

(vi)    appropriate injunctive and/or declaratory relief, as described above, including injunctive relief requiring SAIC to comply with its obligations to design, adopt, implement, control, direct, oversee manage, monitor and/or audit the appropriate processes, controls, policies, procedures and/or protocols to safeguard and protect PII/PHI with which it has been entrusted in compliance with their internal policies and procedures, industry standards and all applicable

Case No.

**CLASS ACTION COMPLAINT**

00077097

laws and regulations, providing the appropriate and effective monitoring services, and educating Class Members;

(vii)    attorneys' fees and litigation expenses;

(viii)   costs of suit; and

(ix)    such other and further relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and all others similarly situated, respectfully demands a trial by jury on all of their claims and causes of action so triable.

Dated: September 26, 2014

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)

By:        *s/ Timothy G. Blood*
          TIMOTHY G. BLOOD

701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

THE COFFMAN LAW FIRM
RICHARD L. COFFMAN
First City Building
505 Orleans St., Suite 505
Beaumont, TX  77701
Tel: 409/833-7700
866/835-8250 (fax)
rcoffman@coffmanlawfirm.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL  60602
Tel: 312/621-2000
312/641-5504 (fax)
b.barnow@barnowlaw.com

*Attorneys for Plaintiff*

BLOOD HURST & O'REARDON, LLP

00077097

40

Case No.

CLASS ACTION COMPLAINT